Brian S. King, #4610
Laura C. Nielson, #15008
**LAW FIRM OF BRIAN S. KING**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
laura@briansking.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Andrew L., Christine W., and Benjamin L., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH, <br><br> Defendants. | Civil No: 1:15-cv-00121-RJS <br><br> **COMPLAINT** |

Plaintiffs Andrew L. ("Andrew"), Christine W. ("Christine") and Benjamin L. ("Ben") (collectively "Plaintiffs") through their undersigned counsel, complain and allege against Defendants United HealthCare Insurance Company ("UHC") and United Behavioral Health ("UBH") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Andrew, Christine and Ben are natural persons residing in New York City, New York. Andrew and Christine are Ben's parents. The Plaintiffs are concerned about keeping their identities confidential in this claim, particularly in light of the sensitive

nature of Ben's mental health treatment.  As a result, Plaintiffs submit this Complaint identifying themselves by only their first name and last initials.

2. Christine works for an employer, The Situs Companies ("Situs"), which provides a variety of benefits to its employees as part of their compensation. These benefits include, but are not limited to, a group health benefit plan ("the Plan").

3. The Plan is administered and insured by UHC, an insurance company doing business throughout the United States and in the State of Utah.

4. UBH is a subsidiary or affiliated company of UHC and administers mental health claims for participants and beneficiaries in the Plan.

5. Ben received care for his mental health conditions at Island View Residential Treatment Center ("IVRTC"), a licensed health care facility in Davis County, Utah. Ben was treated at IVRTC from December 6, 2011 through June 22, 2012.

6. UHC and UBH only processed and paid for services for the first eight days then denied coverage for Ben's medically necessary mental health care.

7. The Plan is an employee welfare benefit plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

8. This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because medical treatment at issue in this case was provided in Utah, UHC and UBH do business in the state of Utah, and UBH has a claims processing facility in Salt Lake County, State of Utah.  In addition, the financial obligations of the Plaintiffs to IVRTC were incurred in the state of Utah.  Finally, the likelihood of preserving the anonymity of the Plaintiffs in this case involving sensitive protected health information and mental health treatment is increased if

the suit is maintained in a location separate from the Plaintiffs' state of residence. Based on ERISA's nationwide service of process provision and 28 U.S.C. § 1391, venue is appropriate in the state of Utah.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due them pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## FACTUAL BACKGROUND

### Ben's Medical History and Treatment

11. Ben displayed behavior suggesting serious emotional disturbances and behavioral disorders from the time he was a young child.

12. A court ordered psychiatric exam during the course of Ben's parent's divorce in September 2004 when he was just ten years old provided for Ben with a diagnosis of borderline personality disorder, eating disorder, major depression and co-occurring alcohol addiction/abuse.

13. Custody disputes between Andrew and Ben's birth mother existed from November 2003 to July 2011.

14. In 2005 Ben started treatment with Dr. Jeffrey Von Kohorn. He was struggling with profound sadness, general anxiety, and aggressive impulses.

15. Ben attended weekly therapy, including therapy with parents and siblings, from 2005 until 2010.

16. Despite this treatment, Ben continued to suffer emotional, social, educational, and family problems.

17. Ben attended Fordham Preparatory School, he was described as a bright boy but was disorganized and failed to turn in work. He also had frequent tardiness and absenteeism.

18. In 2009, Ben's grades take a steep decline resulting in nearly straight F's by the end of 2010 school year.

19. In July, 2011, Ben expressed an intent to harm himself.

20. In September, 2011, Ben was seen by Dr. Henry I. Spitz for a psychiatric evaluation. Dr. Spitz diagnosed Ben with major depressive disorder and treated him over the next several weeks.

21. In October, 2011, Ben was arrested for alcohol possession and drug paraphernalia while visiting his mother. He was hospitalized for alcohol intoxication shortly after that, then disappeared for a week without telling anyone where he was.

22. As Ben's behavior deteriorated, Andrew and Christine became more concerned about his welfare and the failure of outpatient treatment to improve or even keep Ben stable.

23. On December 6, 2011, Andrew and Christine arranged to have Ben admitted to IVRTC.

24. Ben was treated at IVRTC from December 6, 2011, until June 22, 2012.

25. Dr. Michael Connolly, the psychiatrist at IVRTC, completed a psychiatric evaluation on Ben. Dr. Connolly's initial assessment of Ben was as follows:

| | | |
|---|---|---|
| AXIS I: | 311 | Depression, NOS (Likely Major Depressive Disorder Recurrent, Moderate) |
| | 300.00 | Anxiety Disorder, NOS |
| | 305.20 | Cannabis Abuse |
| | 305.00 | Alcohol Abuse |
| | V61.20 | Parent-Child Relational Problem |
| | 313.82 | Identity Problem |
| | V61.21 | Rule Out Physical Abuse or Neglect of a Child Victim Status |
| | 314.9 | Rule out ADHD |
| AXIS II: | | Deferred |
| AXIS III: | | No Known Chronic Illnesses |

4

|  |  |
|---|---|
| AXIS IV: | Severe Secondary to Family Conflict, Peer Support and Education. |
| AXIS V: | Current G.A.F.: 35[1] |
|  | Highest G.A.F. Past Year: 45 |

26. Dr. Connolly stated, "Ben presents as a 17-year-old with a history of significant family dysfunction, including divorce and repetitive custody arrangement changes. Presenting concerns include potential substance abuse, depression, and school failure. Ben appears to have limited insight in terms of relationship issues and his mood. … The family history is somewhat limited but appears to increase risk for personality related problems, substance abuse, eating disorder and potentially mood disorder."

27. Dr. Connolly also stated "The resident has severe individual intrapsychic disorder (mental, emotional and behavioral) and significant disturbances in environmental relationships."

28. A Master Treatment Plan was created for Ben and he participated in a variety of intensive treatments including individual, group, family, substance abuse, milieu, and recreational therapies as well as in an education plan. He also met with Dr. Connolly on a regular basis during the time he was treated at IVRTC.

### The Terms of the Plan for Coverage of Mental Health Conditions

29. The benefits for the Plan are contained in a document entitled "United HealthCare Insurance Company UnitedHealthcare Choice Plus Certificate of Coverage, Health Savings Account (HAS) Plan 7PD for The Situs Companies. ("Plan Certificate")."

30. The Plan Certificate includes the following (emphasis in original):

---

[1] A GAF of 35 for a child or adolescent indicates "major impairment in functioning in several areas and unable to function in one of these areas, i.e., disturbed at home, at school, with peers, or in the society at large, e.g., persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent. Such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category)." http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

5

      We have discretion in accordance with the state and federal law, to do all of to the following:

- Interpret Benefits under the Policy.
- Interpret the other terms, conditions, limitations and exclusions set out in the Policy, including this *Certificate*, the *Schedule of Benefits*, and any Riders and/or Amendments.
- Make factual determinations related to the Policy and its Benefits.

31. In the section captioned "Covered Health Services," the Plan Certificate references "Mental Health Treatment" and states (emphasis in original):

    Services include those services received on an inpatient or Intermediate Care basis in a Hospital or an Alternate Facility, and those received on an outpatient basis in a provider's office or at an Alternate Facility.

    Mental Health Services under this Covered Health Services Benefit Category include services for the following psychiatric illnesses (defined as "Serious Mental Illness") in *Section 9: Defined Terms*):

    - Schizophrenia.
    - Paranoid and other psychotic disorders.
    - Bipolar Disorders (hypomanic, manic, depressive, and mixed).
    - Major depressive disorders (single episode or recurrent).
    - Schizo-affective disorders (bipolar or depressive).
    - Obsessive-compulsive disorders.
    - Depression in childhood and adolescence.

    Benefits for Mental Health Services include:

    - Mental health evaluations and assessment.
    - Diagnosis
    - Treatment Planning
    - Referral Services.
    - Medication Management.
    - Inpatient.
    - Partial Hospitalization/Day Treatment.
    - Intensive Outpatient Treatment.
    - Services at a Residential Treatment Facility.
    - Individual, family and group therapeutic services.
    - Crisis Intervention.

32. Under the section entitled "Exclusions and Limitations," the Plan Certificate states (emphasis in original):

**Mental Health**

1. Services performed in connection with conditions not classified in the current edition of the *Diagnostic and Statistical Manual of the American Psychiatric Association*.

11. Residential treatment services, except as specifically specified described as a Benefit under *Mental Health Services in Section 1: Covered Health Services*.

12. Service or supplies for the diagnosis or treatment of Mental Illness that, in our reasonable judgment, are any of the following:

    - Not consistent with prevailing national standards of clinical practice for the treatment of such conditions.
    - Not consistent with the services backed by credible research soundly demonstrating that the services or supplies will have measurable and beneficial health outcome, and therefore considered experimental.
    - Typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective.
    - Not consistent with our **level of care guidelines** (emphasis added) or best practices as modified from time to time.
    - Not clinically appropriate in terms of type, frequency, extent, site and duration of treatment, and are considered ineffective for the patient's Mental Illness, substance use disorder or condition based on generally accepted standards of medical practice and benchmarks.

### The Level of Care Guidelines

33. The UBH Level of Care Guidelines ("LOCG") consist of criteria to assist in determining what intensity and type of care is appropriate for an insured's health conditions. The Residential Treatment Center level of care guidelines explains the nature of residential treatment services:

    Residential treatment services are delivered in a facility or a freestanding Residential Treatment Center that provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure.

34. In order to qualify a patient for residential treatment, the patient's condition(s) must meet *one* of the following criteria:

1. The member's psychosocial functioning has deteriorated to the degree that the member is at risk for being unable to safely and adequately care for themselves in the community.
2. The member is experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting. (This criterion is not intended for use solely as a long-term solution to maintain the stabilization acquired during treatment in a residential facility/program.)
3. There is an imminent risk of deterioration in the member's functioning due to the presence of severe, multiple and complex psychosocial stressors that are significant enough to undermine treatment at a lower level of care. (This criterion is not intended for use solely as a long-term solution to maintain the stabilization acquired during treatment in a residential facility/program.)
4. A lower level of care in which a member may be effectively treated is unavailable, an intensified schedule of ambulatory care or a change in the treatment plan has not proven effective, or community support services that might augment ambulatory mental health services and pre-empt the need for Residential Treatment are unavailable, insufficient or inadequate.

35. In addition to meeting one of the criteria included in paragraph 37 above, the patient condition must meet *all* of the following (emphasis in original):

1. The member is not at imminent risk of serious harm to self or others.
2. Within 48 hours of admission, the following occurs:
    a. A psychiatrist completes a comprehensive evaluation of the member.
    b. The treating psychiatrist and, whenever possible, the member do the following:
        i) Develop a treatment plan;
        ii) Develop a plan to provide a school-aged child with an adequate educational program;
        iii) Project a discharge date; and
        iv) Develop an initial discharge plan.
    c. With the member's documented consent, the treatment team contacts the member's family/social supports to discuss participating in treatment and discharge planning when such participation is essential and clinically appropriate.
        i) Participation in treatment should be at least weekly.
    d. With the member's documented consent, the treatment team contacts the member's outpatient provider to obtain information about the member's presenting condition and response to treatment.
3. Subsequent psychiatric evaluations and consultations are available 24 hours a day. Visits with the treating psychiatrist occur at least 2 times per week.
4. All relevant general medical services, including assessment and diagnostic, treatment, and consultative services are available as needed and provided with an urgency commensurate with the member's medical need. Co-occurring medical conditions can be safely treated in this level of care.

5. The provider and, whenever possible, the member collaborate to update the treatment plan at least weekly in response to changes in the member's condition, or provide compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition.
    a. Treatment in a residential setting is not for the purpose of providing custodial care, but is for the active treatment of a mental health condition. Active treatment is a clinical process involving 24-hour care that includes assessment, diagnosis, intervention, evaluation of care, treatment and planning for discharge and aftercare. Active treatment is indicated by services that are all of the following:
        i) Supervised and evaluated by a physician;
        ii) Provided under an individualized treatment plan;
        iii) Reasonably expected to improve the member's condition or for the purpose of diagnosis:
        iv) Unable to be provided in a less restrictive setting; and are
        v) Focused on interventions that are based on generally accepted standards of medical practice and are known to address the critical presenting problem(s), psychosocial issues and stabilized the member's condition to the extent that the member can be safely treated in a lower level of care.
6. The provider, and whenever possible, the member collaborate to update the initial discharge plan ultimately ensuring that an appropriate discharge plan is in place prior to discharge. Whenever possible, the treatment team should review the discharge plan with the provider at the next level of care prior to discharge. The final discharge plan should be provided to the Care Advocate at least 24 hours prior to the anticipated date of discharge.
7. The discharge plan must include ALL of the following:
    a. The anticipated discharge date.
    b. The level and modalities of post-discharge care including the following:
        i) The next level of care, its location, and the name(s) of the provider(s) who will deliver treatment;
        ii) The rationale for the referral;
        iii) The date and time of the first appointment for treatment as well as the first follow-up psychiatric assessment;
            (1) The first appointment should be within 7 days of discharge;
        iv) The recommended modalities of post-discharge care and the frequency of each modality;
        v) The names, dosages and frequencies of each medication and a schedule for appropriate lab tests is pharmacotherapy is a modality of post-discharge care;
        vi) Linkages with peer services and other community resources.
    c. The plan to communicate all pertinent clinical information to the provider(s) responsible for post-discharge care, as well as to the member's primary care provider as appropriate.

9

  d. The plan to coordinate discharge with agencies and programs such as the school or court system with which the member has been involved when appropriate and with the member's documented consent.
  e. A prescription for a supply of medication sufficient to bridge the time between discharge and the scheduled follow-up psychiatric assessment.
  f. Confirmation that the member understands and agrees with the discharge plan.
  g. Confirmation that the member was provided with written instructions for what to do in the event that a crisis arises prior to the first post-discharge appointment.

**Note:** This guideline is intended to be used in conjunction with the Continued Service guideline when assessing the need for a continuing stay.

### The Coverage Determination Guidelines

36. Under certain circumstances, UBH also uses the Coverage Determination Guideline ("CDG")

The CDG:

> . . . provides assistance in interpreting behavioral health benefit plans that are managed by [UBH]. . . . When deciding coverage, the enrollee specific document [the Plan Certificate] must be referenced. The terms of an enrollee's document (e.g. Certificates of Coverage (COCs), Schedules of Benefits (SOBs), or Summary Plan Descriptions (SPDs)) may differ greatly from the standard benefit plans upon which this guideline is based. In the event that the requested service or procedure is limited or excluded from the benefit, is defined differently, or there is otherwise a conflict between this document and the COC/SPD, the enrollee's specific benefit document supersedes these guideline

37. Under the heading "**PLAN DOCUMENT LANGUAGE,**" the CDG reiterates (emphasis in original:

> *Before using this guideline, please check enrollee's specific plan document and any federal or state mandates, if applicable*.

### The Plaintiffs' Claims and Appeal Process

38. Claims were submitted to UBH for Ben's treatment at IVRTC and were denied. In a letter from UBH to Ben dated December 16, 2011, UBH asserted that its denial was based on:

> . . . review of the behavioral health services that the member is receiving and progress made, review of the member's Certificate of Coverage [Plan Certificate], review of the UBH [CDG] for Depression Not Otherwise Specified/Major Depression, Residential Treatment, and information previously provided by the treating provider designee.

10

39. The letter went on to state that Ben's condition:

    I have determined that the services the member is receiving are not consistent with the generally accepted standards of medical practice for the treatment of the member's condition per UBH Coverage Determination Guidelines for Depression Not Otherwise specified/Major Depression, Residential Treatment as evidenced by: there is no serious risk of harm to self or others, there are no medical or psychiatric issues that require 24 hour nursing monitoring.

40. The letter concluded:

    Under the terms of the member's Certificate of Coverage for The Situs Companies, Inc., inconsistent or inappropriate services are excluded. Substance abuse intensive outpatient program treatment is offered as an alternative.

41. Andrew and Christine appealed the denial of coverage on May 16, 2012. They stated that they had obtained a copy of the UBH CDG UBH's website. They referred to the statement included in the CDG that the terms of a claimant's Certificate of Coverage would take precedence over the CDG if those documents were in conflict. The Plan Certificate specifically states that the LOCG will be utilized to evaluate the appropriate level of care, includes coverage for residential treatment. They also pointed out to UBH that since UBH authorized the services from December 6, 2011, through December 13, 2011, as medically necessary that the LOCG Continued Service Criteria guidelines would apply for any days after December 13, 2011.

42. Included with the Plaintiffs' appeal was a letter from Dr. Von Kohorn, Ph.D, Ben's treating physician for several years before he was admitted to IVRTC. Dr. Von Kohorn discussed Ben's conditions, the treatments and therapies provided to him, his struggles and lack of progress in outpatient treatment. Ben continued to suffer emotional, social, educational and family problems and that Ben was exposed to overwhelming conflict and felt caught in the middle of a high intensity divorce between his parents.

43. The Plaintiffs also included a letter from Henry Spitz, M.D. Clinical Professor of Psychiatry at Columbia University, who treated Ben from September 21, 2011, through November 29, 2011. Dr. Spitz stated that Ben was non-compliant with outpatient treatment and that repeated outpatient treatment failure is a clear indication for inpatient residential treatment.

44. The Plaintiffs included a letter from Bruce Shapiro M.D., D.L.F.A.P.A., Clinical Professor at Columbia University, who stated that he had treated Ben for a number of years up until the time Andrew was awarded custody of Ben. He stated that Ben suffered from severe and recurrent Major Depressive Disorder. He stated that his depression was precipitated by a very intense and traumatic divorce between his parents. He also stated that the depression led to a significant deterioration in school performance and social functioning. He also stated that all of the medications tried to treat Ben as well as the therapies had failed. He went on to state that inpatient treatment was essential if Ben was to be prevented from suicide and be able to recover for his mental health.

45. The Plaintiffs also included copies of all medical records for Ben at IVRTC to the date of the appeal, as well as a long history of a high intensity, highly contentious divorce with many changes in parental custody that traumatized Ben.

46. On September 14, 2012, UBH maintained its denial of coverage for Ben's residential treatment. The denial stated:

> After fully investigating the substance of the appeal, including all aspects of clinical care involved in this treatment episode, I have determined that benefit coverage is not available for the following reason(s):
>
> Based on the clinical information provided, the applicable Certificate of Coverage for The Situs Companies; and UBH Coverage Determination Guidelines for Residential treatment of Major Depressive Disorder, it is my decision to uphold the previous non-coverage determination. By the last covered day the assessment was completed and there were no observed conditions requiring 24-hour care. There was no serious risk of harm to

12

> self or others, there was no current or expected withdrawal from substances used, there was no psychosis or severe self care deficits.
> . . .
>
> All the treatment interventions could have occurred in a less restrictive outpatient setting. As such, there appeared to be a mismatch between the intensity of services rendered and the severity of the targeted problems. Inconsistent or inappropriate treatment is excluded from coverage according to the Certificate of Coverage for The Situs Companies.

47. UBH's denial referenced reliance on the UBH CDG for Major Depressive Disorder and stated that Ben's condition did not meet the CDG for treatment of that condition.

48. In spite of UBH's assertion that it had "fully investigat[ed] the substance of the appeal," the denial did not address any of the arguments raised by Andrew and Christine in their appeal including, but not limited to, the erroneous reliance on the CDG rather than the LOCG.

49. Andrew and Christine exhausted their pre-litigation appeal obligations under ERISA and the Plan.

## CAUSE OF ACTION
### (Claim for Benefits Pursuant to 29 U.S.C. §1132(a)(1)(B))

114. ERISA imposes higher-than-marketplace quality standards on insurers.  It sets forth a special standard of care upon plan fiduciaries such as UHC and UBH, acting as administrators of ERISA Plans, to "discharge [their] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plans.  29 U.S.C. §1104(a)(1).

115. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators and their agents provide a "full and fair review" of claim denials.  29 U.S.C. §1133(2).

116. The Defendants breached their fiduciary duties to the Plaintiffs when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the interest

of their Plan participants and beneficiaries and for the exclusive purpose of providing benefits to them and to provide a full and fair review of the Plaintiffs' claims.

117. The Defendants breached their fiduciary duties to the Plaintiffs when they failed to discharge their duties "in accordance with the documents and instruments governing the plan . . ." and when they failed to defer to the requirements in the specific Plans to utilize the LOCG and instead relied on the CDG.  29 U.S.C. §1104(a)(1)(D).

118. The actions of the Defendants in failing to provide coverage for Ben's medically necessary residential treatment are violations of the terms of the Plans.

119. The actions of the Defendants, as outlined above, have caused damage to the Plaintiffs in the form of denial of payment for medical services in an amount exceeding $82,000.

120. The Defendants are responsible to pay Ben's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Ben's medically necessary residential treatment under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 14th day of September, 2015.

                                         s/ Brian S. King
                                         Brian S. King
                                         Attorney for Plaintiffs

Plaintiffs' Address:

New York City, New York